IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHEKIR THOMAS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GEORGE LITTLE, *et al.*, | : | NO. 22-2246 |
| Defendants. | : | |

## MEMORANDUM

**Perez, J.**                                                                                                    July 3, 2024

*Pro se* Plaintiff Shekir Thomas ("Mr. Thomas") brought this prisoner civil rights action pursuant to 42 U.S.C. § 1983 alleging that Defendants[1] violated his rights under the Eighth and Fourteenth Amendments by retaining him in solitary confinement without due process of law and with deliberate indifference to his mental health conditions. Mr. Thomas is currently incarcerated at Pennsylvania State Correctional Institution at Phoenix (SCI-Phoenix). He is serving a sentence of 15 to 40 years for attempted homicide and robbery.

Presently before the Court is Mr. Thomas' motion seeking a temporary restraining order and preliminary injunction, which Mr. Thomas filed following his suicide attempt on May 29, 2024. This Court held a hearing on Plaintiff's motion on June 20, 2024. Mr. Thomas asks this Court to issue an order releasing him into the prison's general population and instructing the prison to provide him adequate mental health treatment. This Court finds that Plaintiff is likely to succeed on the merits of his case, however his request for injunctive relief fails on other grounds.

---

[1] Mr. Thomas is suing a number of prison officials employed by the Department of Corrections ("DOC"): Secretary John Wetzel, Secretary George Little, Secretary Dr. Laurel R. Harry, SCI-Phoenix Superintendent J. Terra, SCI-Phoenix Unit Manager Jamie Luquis, Dr. Matteo, and C. Stickney.

1

I.     BACKGROUND

Mr. Thomas has been incarcerated in the Pennsylvania state system since 2015. He was placed in the Restricted Housing Unit (RHU) for 330 days at SCI-Albion following his assault of a correctional officer[2] on January 29, 2020.[3] Mr. Thomas alleges that the prison has continually misdiagnosed his mental health conditions, improperly prescribed his medications, and failed to provide him adequate health services.

On June 16, 2021, upon his release from the RHU, Mr. Thomas was placed on the Restricted Release List ("RRL") and subsequently transferred to SCI-Phoenix on September 21, 2021.[4] RRL is a status assigned to inmates who "pose[ ] a threat to the secure operation of the facility" that cannot be alleviated by transfer to another facility.[5] Mr. Thomas is currently housed in the Intensive Management Unit ("IMU"), a six-tiered program designed to progressively increase the privileges of RRL-designated inmates until they are released back into general population at the prison. N.T.[6] at 54-55. Each successive phase of the IMU confers increased privileges, including more time inmates can spend outside their cell, more opportunities to gather with other inmates, and increased outside contact.[7] Mr. Thomas is presently in Phase 4 of the IMU. *Id.* at 58. The prison contends that Mr. Thomas maintains the following privileges in Phase 4:

---

[2] While it was not made clear on the record during the injunction hearing, it appears from other filings and public dockets that this assault resulted in a subsequent conviction for Mr. Thomas. He pled guilty to assault by prisoner on April 16, 2021, and was sentenced to a consecutive term of incarceration of 30 – 60 months.
[3] ECF No. 25 at 2.
[4] *Id.*
[5] COMMONWEALTH OF PA., DEP'T OF CORR., POL'Y NO. DC-ADM 802, ADMINISTRATIVE CUSTODY PROCEDURES § 1.C.1 (2024), ECF No. 122 at 1-5.
[6] All references to Notes of Testimony ("N.T.") are to testimony taken on June 20, 2024 at the preliminary injunction before this Court.
[7] SCI-PHOENIX INTENSIVE MGMT. UNIT, INMATE HANDBOOK (2022), ECF No. 122 at 3-13.

> 2 hours per day of exercise, out of cell, 7 days per week, with up to 2 other inmates; 3 phone calls per week; 3 tablet/kiosk (email) per week; 5 video visits per month; tv/radio privileges; participation in group treatment; weekly unit management contact and psychological contact as required by DOC 13.8.1; $50 per week commissary; education approved by Unit Management Team; access to mini law library and 2 recreational books; in cell games; and 2 meals per week with up to 2 other inmates.[8]

Mr. Thomas disputes that SCI-Phoenix provides many of the privileges it claims to, and that the privileges are less robust than their handbook description would suggest. For instance, the prison does not presently offer group treatment and the only interaction he has with other inmates is in the yard while each are held in separate cages. N.T. at 15. Inmates do not have weekly contact with representatives from unit management. The "psych team" visits infrequently, and, according to Mr. Thomas, only if an inmate makes repeated requests. *Id.*

During the June 20, 2024 injunction hearing, Mr. Thomas testified about the effect prolonged isolation has had on his mental health. He reported that he is presently prescribed Busbar and Tegretol, neither of which are sufficiently addressing his symptoms. *Id.* at 16. Mr. Thomas also testified about his autism spectrum disorder; a diagnosis given when he was child, for which he attended a specialized school throughout his adolescence. *Id.* at 16-18. Dr. Linda Miller, a licensed psychologist with the Department of Corrections, testified that Mr. Thomas was evaluated by another clinician at the prison for autism, and while some features of the disorder were reported, there was insufficient information or records to diagnose. *Id.* at 81.

It is Mr. Thomas' belief that the prison has misdiagnosed him. He explained that, upon entering the DOC, he was re-diagnosed with anti-personality disorder, schizophrenia and paranoia. Prior to his detention and while in local county custody, Mr. Thomas had been prescribed Abilify. *Id.* at 16. The modified treatment he started receiving from the DOC caused

---

[8] ECF No. 122 at 3-14.

him to experience new symptoms, including hallucinations and suicidal ideations. *Id.* Mr. Thomas further alleges that his deteriorating mental health is what caused him to "lash out" at prison staff at SCI-Albion, which is why he was placed on the RRL in the first place.[9] His requests to be placed in a separate therapeutic mental health unit of the prison have been ignored or denied. *Id.* at 63.

While in custody, Mr. Thomas alleges that he has attempted suicide approximately 20 times.[10] He avers that his mental health has deteriorated significantly as a result of his prolonged isolation. Since his transfer to SCI-Phoenix, his myriad attempts at suicide have included trying to hang himself, eating glass, and overdosing on pills. *Id.* at 26-27. His most recent attempt occurred on May 27, 2024, in which he ingested a pair of nail clippers in the presence of prison staff. *Id.* at 58. Following his most recent attempt, Mr. Thomas spent about 24 hours in a psychiatric observation cell before being discharged by his regular mental health provider, Dr. Glushakow. *Id.* at 83. Prior to his discharge, Mr. Thomas reported that he was not suicidal. *Id.*

As part of SCI-Phoenix's annual review of Mr. Thomas' placement on the RRL, Dr. Miller has evaluated him on three occasions. *Id.* at 79. Dr. Miller's most recent evaluation took place on May 29, 2024, two days after Mr. Thomas' most recent suicide attempt involving the nail clippers. *Id.* at 82. She testified that, despite his characterization of the incident as a suicide attempt, his "mood and demeanor were not congruent with what he was reporting." *Id.* at 80-81. Mr. Thomas was not suicidal at the time of her evaluation. Dr. Miller observed that his behavior was future-oriented and he did not report any active delusions. *Id.* Dr. Miller failed to provide any credible support for her speculative conclusion that Mr. Thomas has, at times, feigned his

---

[9] *Id.* at 64, ¶¶ 21-22.
[10] The record is inconsistent regarding the number of suicide attempts alleged nor is it clear how many attempts occurred while Mr. Thomas was in isolation or in general population.

symptoms of his mental health conditions and suicidality for secondary gain.[11] She concluded that her evaluation and review of Mr. Thomas' mental health record presented "no immediate psychological concerns . . . that would preclude him from his placement on the [RRL], [or assignment] to the [IMU]."[12]

## II.     STANDARD OF REVIEW FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Further, where the requested preliminary injunctive relief "is directed not merely at preserving the status quo but ... at providing *mandatory* relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) (emphasis added).

Used sparingly, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Preliminary injunctive relief "should be granted only in limited circumstances." *Kos Pharm.*, 369 F.3d at 708 (citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). Specifically, the movant must demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even

---

[11] Moreover, this Court is reluctant to make broad findings about Mr. Thomas' overall health and the adequacy of the treatment he has received from the prison based on Dr. Miller's testimony. Dr. Miller has only met with Mr. Thomas on three occasions. She performed these annual reviews in order to make a recommendation to the prison on whether to approve or deny Mr. Thomas' continued status on the RRL. Therefore, her conclusions cannot be used to draw a comprehensive picture of Mr. Thomas' overall mental health. This Court will only make findings based upon Dr. Miller's testimony that Mr. Thomas was not acutely psychotic or in immediate danger of harming himself when she most recently evaluated him.
[12] ECF No. 122-7 at 3.

greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharm.*, 369 F.3d at 708. It is the movant's burden to establish requirements for injunctive relief, especially for the first two prongs. *See Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975). The first two prongs are considered "gateway factors" and are "the most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 (3d Cir. 2017). Once the "gateway factors" are met, a court should "consider[ ] the remaining two factors" and then "determine[ ] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

### III. ANALYSIS

**1. Reasonable Success on the Merits**

To establish a "reasonable probability of success on the merits," a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. *Punnett v. Carter,* 621 F.2d 578, 582–83 (3d Cir.1980). The district court must examine the legal principles controlling the claim and the potential defenses available to the opposing party. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if the evidence clearly satisfies the essential prerequisites of the cause of action. *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 173 (3d Cir. 2001).

Mr. Thomas roots his request for a preliminary injunctive relief in his Eighth Amendment cruel and unusual punishment claim,[13] urging that his prolonged isolation and continued

---

[13] Mr. Thomas also raises a Due Process claim in his Amended Complaint. However, "a district court need only determine that the moving party would likely succeed on one claim to issue injunctive relief." *See Johnson v. Wetzel*, 209 F. Supp. 3d 766, 775 (M.D. Pa. 2016) (citations omitted). As such, this Court will limit its discussion to Mr. Thomas' Eighth Amendment Claim, as the remaining three factors for injunctive relief will be identical.

6

placement on the RRL deny him the basic constitutional guarantees of humane treatment. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. Cruel and unusual punishment is punishment that "violates civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). The Supreme Court has observed that the Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations and quotation marks omitted).

In determining whether prison officials violate an inmate's Eighth Amendment right, the Third Circuit directs this Court to apply a two-prong test, which contains an objective prong and a subjective prong. Under the objective prong, "the deprivation must be objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Under the subjective prong, "the prison official must have been deliberate[ly] indifferen[t] to inmate health or safety." *Id.* "An official is deliberately indifferent if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* "Whether conditions constitute cruel and unusual punishment is measured against the evolving standards of decency that mark the progress of a maturing society." *Id.* (internal citations and quotation marks omitted). In addition, the Court "may also consider whether officials had a legitimate penological purpose behind their conduct. The Eighth Amendment prohibits punishments without penological justification." *Id.* (internal citations and quotation marks omitted).

Turning to the first prong, Mr. Thomas must demonstrate that he has been subjected to an objectively "serious" deprivation of life's basic needs or a "substantial risk of serious harm" to his health. *Porter*, 974 F.3d at 441 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Prison officials have a duty "to ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . take reasonable measures to guarantee the safety of the inmates." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (internal citations omitted).

To satisfy the objective prong, "an inmate need not provide evidence of actual injury. . . the inmate need only offer evidence that there was a 'substantial risk of serious harm.' " *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020). "It is well established in both case law and scientific and medical research that prolonged solitary confinement ... poses a substantial risk of serious psychological and physical harm." *Id.* In *Porter*, the Third Circuit held that the consensus of medical evidence addressing prolonged solitary confinement "makes plain that a reasonable jury could conclude that thirty three years in solitary confinement posted a substantial risk of harm to Porter." *Id.* at 443; *see also Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (acknowledging "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement.")

Turning next to the subjective prong of the test, "an inmate must show that the prison official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Porter*, 974 F.3d at 446 (internal citations and quotation marks omitted). The inmate "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Betts v. New Castle*

8

*Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer*, 511 U.S. at 842–43) (internal quotation marks omitted). The "deliberate indifference" test requires that a defendant actually know of and disregard "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842).

A prisoner's mere placement on the RRL does not, in and of itself, violate the Constitution. "To establish an Eighth Amendment claim, the plaintiff must adduce evidence beyond the mere fact that he was placed on the RRL or in solitary confinement." *Reaves v. Rossman*, Civil Action No. 3:21-cv-01282, 2022 WL 18539772, *5 (M.D. Pa. July 1, 2022) (citing *Booze v. Wetzel*, Civil Action No. 1:13-cv-02139, 2014 WL 1515562, at *4 (M.D. Pa. Apr. 17, 2014).

Here, Mr. Thomas' allegations go far beyond a mere assertion that his RRL placement has damaged his mental health. Mr. Thomas has attempted to commit suicide as many as 20 times while in custody. He has been punished with isolated confinement based upon behaviors that were *caused* by his mental illnesses. This Court is left to question the appropriateness of Mr. Thomas' placement on the RRL in light of his mental illness and numerous suicide attempts. Defendants minimize or wholly disregard Mr. Thomas' vulnerabilities and fail to present any evidence to suggest these were anything but bona fide suicide attempts. The Court is confused by Defendants preoccupation with whether Mr. Thomas has a history of "feigning symptoms for secondary gain." N.T. at 46. It is immaterial whether Mr. Thomas' suicide attempts were motivated by secondary gain—he either did or did not attempt to kill himself. The Court will not

9

engage in any analysis which presumes that certain suicide attempts are less significant due to a person's underlying motivations.

Defendants know about the risks of prolonged solitary confinement and the particular vulnerability of mentally ill inmates. The substantial risks of prolonged solitary confinement are "obvious," "longstanding, pervasive, well-documented, [and] expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. Numerous courts have specifically found that Defendant Secretary Wetzel, one of the named Defendants who would have been authorized to remove Mr. Thomas from the RRL, is well aware of the mental health risks inherent in prolonged isolation. *See Porter v. Pennsylvania Dep't of Corr.,* 974 F.3d 431, 445 (3d Cir. 2020); *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017); *Johnson v. Wetzel,* 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016).

Based on Mr. Thomas' allegations that the prison has continued to isolate him despite numerous suicide attempts, and the effect these conditions of confinement have had on his known and pleaded mental illness, he sufficiently alleges: (1) an objectively, sufficiently serious denial of the minimal civilized measure of life's necessities and (2) that prison officials were deliberately indifferent to his mental health and physical safety. This matter should proceed to summary judgment with the benefit of a full record before the Court.

2. **Irreparable Harm**

Irreparable injury is harm of such an irreversible character that prospective judgment would be inadequate to make the moving party whole. *See Anderson v. Davila,* 125 F.3d 148, 163 (3d Cir.1997); *Instant Air Freight Co. v. C.F. Air Freight, Inc*., 882 F.2d 797, 801 (3d Cir.1989). The mere risk of injury is not sufficient to meet this standard. Rather, the moving

party must establish that the harm is imminent and probable. *Anderson*, 125 F.3d at 164. Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable." *Instant Air Freight,* 882 F.2d at 801.

The movant bears the burden of establishing a "clear showing of immediate irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989). A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent future irreparable harm. This is not an easy burden as the claimed injury cannot merely be possible, speculative or remote. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).

During Mr. Thomas's psychological evaluation by Dr. Miller two days after his most recent suicide attempt in which he ingested a set of nail clippers, he was not experiencing suicidal thoughts. He had been discharged from the psychiatric observation cell within 24 hours upon reporting that he was not suicidal. Mr. Thomas' positive mood and commitment to exercise and weight loss demonstrate that he was not actively contemplating self-harm during that time. Mr. Thomas does not dispute these observations made by Defendants and instead focuses much of his request for relief on past misdiagnoses by the prison. Mr. Thomas filed his motion for injunctive relief on June 5, 2024, approximately 11 days after his suicide attempt and two weeks after Dr. Miller's evaluation. Mr. Thomas did not testify to any shift in his psychological health from the time he was seen by Dr. Miller and when he appeared before this Court on June 20, 2024.

While Mr. Thomas has credibly raised the issue of inadequate mental health treatment and Defendants' deliberate indifference before this Court, an injunction cannot issue to simply eliminate the possibility of a future denigration in his mental health or as redress for past harms. The record does not reflect any imminent emergency that would necessitate this extraordinary

form of relief. Moreover, because Mr. Thomas' requested relief would change the status quo, his burden is particularly heavy. Because Mr. Thomas cannot satisfy the second requisite gateway factor for issuance of a preliminary injunction, this Court need not evaluate the remaining factors.

## IV. CONCLUSION

For the aforementioned reasons, this Court will deny Plaintiff's request for a temporary restraining order or preliminary injunction. An appropriate order will follow.